**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DENISE DEANGELIS, derivatively on behalf of ANAVEX LIFE SCIENCES CORP.,<br><br>Plaintiff,<br><br>vs.<br><br>CHRISTOPHER MISSLING, JIONG MA, PETER DONHAUSER, AXEL PAEGER, STEFFEN THOMAS, and CLAUS VAN DER VELDEN,<br><br>Defendants,<br><br>and<br><br>ANAVEX LIFE SCIENCES CORP.,<br><br>Nominal Defendant. | Case No.:<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Denise DeAngelis ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Anavex Life Sciences Corp. ("Anavex" or the "Company"), files this Verified Shareholder Derivative Complaint against Christopher Missling ("Missling"), Jiong Ma ("Ma"), Peter Donhauser ("Donhauser"), Axel Paeger ("Paeger"), Steffen Thomas ("Thomas"), and Claus van der Velden ("van der Velden") (collectively, the "Individual Defendants," and together with Anavex, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Anavex, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets, and against Defendant Missling for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's

complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Anavex, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Anavex's directors and officers from November 26, 2025 through August 28, 2026, both dates inclusive (the "Relevant Period").

2. Anavex is a biopharmaceutical Company that purports to develop medications for the treatment of various central nervous system ("CNS") diseases such as Alzheimer's disease and Parkinson's disease. Among the Company's more notable products in development are ANAVEX®2-73 ("Anavex 2-73" or "blarcamesine) and ANAVEX®3-71 ("Anavex 3-71").

3. The Company's products are currently still in the clinical stages of research and development, and as such have not yet generated income. However, Anavex has recorded income pertaining to research and development grants. For instance, Anavex received a $1 million research grant from the Michael J. Fox Foundation for Parkinson's Research, as of September 30, 2025.

Moreover, the Company has received research and development incentive income from the Australian government, including $0.6 million during fiscal year ("FY")[1] 2025.

4. Throughout the Relevant Period, the Individual Defendants touted the Company's internal controls over financial reporting and the overall accuracy of its filings with the SEC. However, during the Relevant Period, Defendant Missling, in breach of his fiduciary duties owed to Anavex, willfully or recklessly made and/or caused the Company to engage in various forms of conduct that inhibited it from maintaining internal controls over its financial reporting and, *inter alia*, resulted in the Company understating its regulatory challenges. Specifically, Defendant Missling engaged in misconduct against Company policy which willfully or recklessly caused the Anavex to, *inter alia*: (1) fail to maintain internal controls over its financial reporting; (2) maintain a Company environment which failed to prioritize regulatory and clinical compliance and even disincentivized such efforts; and (3) understate the regulatory challenges facing its business operations (collectively, the "CEO Misconduct").

5. For instance, on November 25, 2025, the Company filed its Annual Report on Form 10-K with the SEC to report its financial and operational results for FY 2025 (the "FY 2025 10-K"). The FY 2025 10-K stated that "***Based on this evaluation, our Chief Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures were effective as of September 30, 2025***."[2] The FY 2025 10-K added that "***Based on this evaluation, our management concluded that our internal controls over financial reporting were effective as of September 30, 2025.***"

---

[1] Anavex's fiscal year does not mirror the calendar year, but instead starts on October 1 and ends on September 30 each year.
For the period between October 1, 2024 and September 30, 2025 ("FY 2025").
For the period between October 1, 2025 and September 30, 2026 ("FY 2026").
[2] Unless otherwise stated, all emphasis herein is added.

6. However, the truth began to emerge on May 6, 2026, when the Company filed a Current Report on Form 8-K with the SEC to disclose the termination of Defendant Missling as the Company's CEO for cause (the "CEO Termination 8-K"). The CEO Termination 8-K stated that "***a special committee*** [of the Company] ***terminated the employment of Christopher Missling, PhD as the Company's Chief Executive Officer for Cause*** . . . ***effective immediately, for, among other things, conduct that the Special Committee believed was inconsistent with Company policy***."

7. On this news, the price per share of the Company's stock fell $0.02, or approximately 0.6%, from a closing price of $3.36 per share on May 5, 2026, to close at $3.34 per share on May 6, 2026.

8. The truth continued to emerge on May 11, 2026, when the Company filed a Notification of Late Filing on Form 12b-25 with the SEC (the "May 2026 Notification of Late Filing"), which informed investors that the Company would be unable to timely file its Quarterly Report for the second quarter of FY 2026.

9. On this news, the price per share of the Company's stock fell $0.18, or approximately 5.5%, from a closing price of $3.24 per share on May 11, 2026, to close at $3.06 per share on May 12, 2026.

10. The truth fully emerged on August 28, 2026, after the market closed, when the Company filed an amended Annual Report on Form 10-K/A with the SEC to report its financial and operational results for FY 2025 (the "Amended FY 2025 10-K"). The Amended FY 2025 10-K noted that "[*a*]***s a result of the review by the Special Committee, management, in consultation with the Audit Committee of the Board (the 'Audit Committee'), concluded that there was a material weakness in internal control over financial reporting that existed at September 30,***

***2025***[***,***]" because, *inter alia*, "***the former CEO failed to foster an environment which prioritized regulatory and clinical compliance and in fact took steps to disincentivize such efforts.***"

11. Also during the after-market hours of August 26, 2026, the Company filed an amended Quarterly Report on Form 10-Q to report its financial and operational results for the first quarter of FY 2026 (the "Amended Q1 FY 2026 10-Q"). The Amended Q1 FY 2026 10-Q further noted the material weakness in the Company's internal controls over financial reporting disclosed in the Amended FY 2025 10-K.

12. In addition, during the after-market hours of August 26, 2026, the Company filed its Quarterly Reports on Forms 10-Q with the SEC, to report its financial and operational results for the second quarter of FY 2026 (the "Q2 FY 2026 10-Q") and the third quarter of FY 2026 (the "Q3 FY 2026 10-Q"). The Q2 FY 2026 10-Q and the Q3 FY 2026 10-Q both reaffirmed the Company's disclosures in the Amended FY 2025 10-K concerning its inadequate controls over financial reporting.

13. On this news, the price per share of the Company's stock fell $0.19, or approximately 6.4%, from a closing price of $2.99 per share on August 28, 2026, to close at $2.80 per share on August 31, 2026.

14. Throughout the Relevant Period, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Defendant Missling engaged in the CEO Misconduct; (2) the Company would terminate Defendant Missling for cause due to the CEO Misconduct; (3) the Company would be unable to timely file the Q2 FY 2026 10-Q; and (4) the Company would have to amend the FY 2025 10-K and the Q1 FY 2026 10-Q to account for the material weaknesses in its internal controls as a result of the CEO Misconduct. As a result of the

foregoing, the Company's public statements were materially false and misleading at all relevant times.

15. The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

16. In light of the Individual Defendants' misconduct—which has subjected the Company and its former President and Chief Executive Officer ("CEO") to a federal securities class action lawsuit pending in United States District Court for the Southern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the Defendant Missling's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. §78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21. Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22. Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

23. Plaintiff is a current shareholder of Anavex. Plaintiff has continuously held shares of Anavex common stock at all relevant times. Plaintiff is a citizen of Florida.

### Nominal Defendant Anavex

24. Anavex is a Nevada corporation with principal executive offices at 630 5th Avenue, 20th Floor, New York, New York 10111. Anavex's common stock trades on the NASDAQ Stock

Market LLC ("NASDAQ") under the ticker symbol "AVXL." Anavex is a citizen of New York and Nevada.

**Defendant Missling**

25. Defendant Missling served as the Company's President and CEO from July 2013 until his termination for cause on April 30, 2026. Defendant Missling also served as a Company director from July 2013 to September 24, 2026. Upon information and belief, Defendant Missling is a citizen of New York.

26. The Schedule 14A the Company filed with the SEC on April 25, 2025 (the "2025 Proxy Statement") stated the following about Defendant Missling, in relevant part:

> Christopher Missling, age 59, has over twenty years of healthcare industry experience in big pharmaceutical, biotech and investment banking. Most recently, from March 2007 until his appointment by our Company, Dr. Missling served as the head of healthcare investment banking at Brimberg & Co. in New York, New York. In addition, Dr. Missling served as the Chief Financial Officer of Curis, Inc. (NASDAQ: CRIS) and ImmunoGen, Inc. (NASDAQ: IMGN). Dr. Missling earned his MS and PhD from the University of Munich and an MBA from Northwestern University Kellogg School of Management and WHU Otto Beisheim School of Management. Dr. Missling has served as President, Chief Executive Officer and Director for the Company since July 2013.

**Defendant Ma**

27. Defendant Ma has served as a Company director since May 2021 and as the Company's Independent Chair of the Board since November 2021. Defendant Ma currently serves as a member of the Audit Committee and as a member of the Executive Committee.[3] Upon information and belief, Defendant Ma is a citizen of New York.

---

[3] On September 24, 2026, the Company issued an open letter to stockholders in which it announced that it "intends to promptly refresh its committee memberships[,]" adding that "Anavex will disclose the new committee assignments after the final voting results are filed." *Anavex Stockholders Elect All of the Company's Director Nominees at 2026 Annual Meeting*, Anavex Life Sciences Corp. (Sep. 24, 2026), https://anavex.com/news/leading-independent-proxy-advisory-firm-iss-recommends-stockholders-vote-for-all-six-of-anavexs-highly-qualified-director-nominees-2/. However, as of the date of filing of this complaint, the Company has yet to disclose

28. The Schedule 14A the Company filed with the SEC on August 11, 2026 (the "2026 Proxy Statement") stated the following about Defendant Ma:

> Dr. Jiong Ma, age 62, has over 30 years of experience investing in, building and scaling technology and life sciences companies globally. She has served as a director of SES AI Corporation (NYSE: SES), a developer of AI-enhanced, high-performance Li-Metal and Li-ion batteries, since February 2022 and Lead Independent Director of the board of SES AI Corporation since May 2022. Since July 2024, she has served as a General Partner at Phoenix Venture Partners, investing in next-generation computing, AI/data-center infrastructure, advanced manufacturing and energy companies. She has led investments at and serves or has served as a board member of several companies across the firm's portfolio, including ODC, Qolab, Figure8 and Nexus Photonics, and provides strategic guidance, governance oversight and capital formation support. To date, the portfolio of Phoenix Venture Partners has achieved three successful exits, including through the acquisition of Nexus Photonics by IonQ (NYSE: IONQ) in June 2026, Nubis Communications by Ciena (NYSE: CIEN) in October 2025 and the acquisition of Cotsworks by Moog (NYSE: MOG.A) in August 2025.
>
> From December 2023 to July 2024, Dr. Ma was an independent business consultant. From March 2021 to December 2023, Dr. Ma founded and led Chavant Capital Acquisition Corporation (NASDAQ: CLAY), a special purpose acquisition company, which she guided through its combination with Mobix Labs (NASDAQ: MOBX) in December 2023. Dr. Ma served on the board of Chavant Capital Acquisition Corporation from March 2021 to December 2023 and Mobix Labs from December 2023 to January 2024. Prior to this, she spent 12 years as Senior Partner at Braemar Energy Ventures, serving on the Investment Committee and leading investments in resource efficiency, e-mobility, and renewable energy, with board seats at more than 10 portfolio companies and multiple exits via M&A and IPO.
>
> Earlier in her career, Dr. Ma led venture investments across TMT, digital health, and cleantech at 3i Group. She began her career in senior roles at Lucent Technologies and Bell Labs, and was a founding team member of Onetta, a fiber-optics startup later acquired by Bookham.
>
> Dr. Ma holds a doctorate (Ph.D.) in Electrical & Computer Engineering from the University of Colorado at Boulder and a Master of Science (M.S.) in Electrical Engineering from Worcester Polytechnic Institute. She is a Kauffman Fellow and is currently serving as a Member of the Engineering Advisory Council of CU Boulder College of Engineering and Applied Science.

---

any new committee assignments. As such, the Individual Defendants' committee assignments are referenced herein as they are set forth in the 2026 Proxy Statement.

> Dr. Ma has served as a member of the Board since 2021. The Executive Committee believes Dr. Ma is qualified to serve as a member of the Board because she brings deep financial, transactional and capital markets expertise to the Board, with substantial experience investing in, partnering with and working with management teams to set strategy for disruptive technology and life sciences companies to shape the business, accelerate growth and drive long-term shareholder value.

**<u>Defendant Donhauser</u>**

29. Defendant Donhauser has served as a Company director since February 2017. Defendant Donhauser currently serves as a member of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Upon information and belief, Defendant Donhauser is a citizen of Germany.

30. The 2026 Proxy Statement stated the following about Defendant Donhauser:

> Dr. Peter Donhauser, age 60, is a physician and clinical research leader with more than 20 years of experience in integrated medical care, clinical trial oversight and private practice leadership. He has practiced osteopathic medicine in private practice since 2000, specializing in an integrated approach to patient care, providing the Board with valuable clinical and patient-centered expertise.
>
> Dr. Donhauser is also the Founder of MedCon Medical Consulting, which was founded in approximately 1995, an education-focused consultancy that provides physician training in the treatment of osteoporotic diseases and delivers osteopathic courses for medical professionals and patients. Earlier in his career, he worked at the University Hospital of Munich, where he focused on geriatrics and neuromusculoskeletal diseases. During his tenure, he conducted clinical research across more than 12 Phase III trials in collaboration with leading global pharmaceutical companies, including Merck, Organon, Procter & Gamble, Roche, Servier and Sanofi.
>
> He holds a degree in human medicine from the University of Munich, as well as a diploma in osteopathy (D.O.) from the German-American Academy for Osteopathy (DAAO) and the European Register for Osteopathic Physicians (EROP) at the Philadelphia College of Osteopathic Medicine.
>
> Dr. Donhauser has served as a member of the Board since 2017. The Executive Committee believes Dr. Donhauser is qualified to serve as a member of the Board because he brings critical, relevant experience to the Board as a clinical expert leading research across numerous trials for some of the world's leading global pharmaceutical companies.

**<u>Defendant Paeger</u>**

31. Defendant Paeger has served as a Company director since February 23, 2026. Defendant Paeger currently serves as a member of the Executive Committee. Upon information and belief, Defendant Paeger is a citizen of Switzerland.

32. The 2026 Proxy Statement states the following about Defendant Paeger:

> Dr. Axel Paeger, age 61, is an experienced healthcare executive and corporate leader with more than 30 years of clinical, operational and executive leadership experience. Dr. Paeger currently serves as Chief Executive Officer of AMEOS Group, which he founded as a start-up in 2002 and scaled into one of Europe's leading healthcare providers. Under his leadership, the Zürich-headquartered group has grown to operate 85 hospitals and polyclinics alongside 23 long-term care facilities across the DACH region (Germany, Austria and Switzerland), employing approximately 19,300 people and treating approximately 500,000 patients annually. AMEOS is a market leader in psychiatric inpatient care in the DACH region and a major provider of inpatient neurological care.
>
> Prior to founding AMEOS, Dr. Paeger served as Chief Executive Officer of Asklepios Kliniken GmbH, one of Germany's largest private hospital operators, following leadership positions at Pacific Health Corporation in the United States and early clinical training at Massachusetts General Hospital. From 2005 to 2009, he also served as a member of the Supervisory Board of Ascom Group (SWX: ASCN), an international telecommunications and security solutions company.
>
> Dr. Paeger holds a Doctor of Medicine (M.D.) from Ludwig Maximilian University of Munich, and a Master of Business Administration (MBA) from Erasmus University Rotterdam and a Master of Business Informatics (MBI) from Case Western Reserve University. Dr. Paeger was recommended to the Board by an independent director as the successor to our former director Athanasios Skarpelos.
>
> Dr. Paeger has served as a member of the Board since 2026. The Executive Committee believes Dr. Paeger is qualified to serve as a member of the Board because he is a medically trained executive leader who brings deep experience in healthcare to the Board as founder of a leading healthcare provider in Europe.

**<u>Defendant Thomas</u>**

33. Defendant Thomas served as a Company director from June 2015 to September 24, 2026. Upon information and belief, Defendant Thomas is a citizen of Germany.

34. The 2025 Proxy Statement states the following about Defendant Thomas, in relevant part:

> Steffen Thomas, age 59, has over 15 years of experience as a European patent attorney and is currently practicing, since September 2011, at Epping Hermann Fischer, a major intellectual property law firm in Europe. Previously, he worked for Japan-based Takeda Pharmaceutical Company, the largest pharmaceutical company in Asia and a top firm worldwide, as an in-house patent attorney. Prior to that, he worked for Nycomed Pharma, acquired by Takeda in 2011 for approximately USD $10 billion. Dr. Thomas' legal practice covers drafting of patent applications, prosecuting patent applications before national and international patent offices, defending and challenging patents in opposition, appeal, and nullity proceedings, enforcing patents before the infringement courts, and preparing opinions on patentability and infringement in the technical field of chemistry. Dr. Thomas has particular expertise in small molecule pharmaceuticals. He holds MS and PhD degrees in Chemistry from the University of Munich. Dr. Thomas has served on the Board since June 2015.

**<u>Defendant van der Velden</u>**

35. Defendant van der Velden has served as a Company director since March 2018. Defendant van der Velden currently serves as the Chair of the Audit Committee, as the Chair of the Nominating and Corporate Governance Committee, and as the Chair of the Compensation Committee. Moreover, Defendant van der Velden currently serves as a member of the Executive Committee. Upon information and belief, Defendant van der Velden is a citizen of Germany.

36. The 2026 Proxy Statement states the following about Defendant van der Velden:

> Dr. Claus van der Velden, age 53, is an accomplished finance executive with more than two decades of experience in leading finance, governance and enterprise oversight functions for publicly traded and technology-driven companies in Germany. Since May 2021, he has served as Chief Financial Officer and Managing Director of NetCologne GmbH, a regional telecommunications provider in Germany.
>
> From July 2011 to May 2021, Dr. van der Velden served as Corporate Head of Management Accounting, Internal Audit and Risk Management at Ströer SE & Co. KGaA, a publicly listed German digital media company, where he was responsible for management accounting, internal audit, enterprise risk management, information security risk assessments and internal control programs.
>
> Previously, Dr. van der Velden served as Director of Corporate Business Controlling for the Nutrition & Health business unit at Cognis, a global supplier of nutritional ingredients and specialty chemicals, where he also served as a compliance representative and member of the global leadership team. Following

> BASF's acquisition of Cognis, he was responsible for the management accounting processes of BASF's Nutrition & Health division. Earlier in his career, Dr. van der Velden worked as a strategy consultant at an international marketing and strategy consulting firm.
>
> Dr. van der Velden holds a degree in economics from the University of Kiel and a doctorate (Ph.D.) in business management from the WHU-Otto Beisheim School of Management, where he also previously taught economics.
>
> Dr. van der Velden has served as a member of the Board since 2018. The Executive Committee believes Dr. van der Velden is qualified to serve as a member of the Board because he brings accounting and executive financial experience to the Board that provides critical perspective on accounting and capital allocation strategy.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

37. By reason of their positions as officers, directors, and/or fiduciaries of Anavex and because of their ability to control the business and corporate affairs of Anavex, the Individual Defendants owed Anavex and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Anavex in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Anavex and its shareholders so as to benefit all shareholders equally.

38. Each director and officer of the Company owes to Anavex and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

39. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Anavex, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40. To discharge their duties, the officers and directors of Anavex were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Anavex, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Anavex's Board at all relevant times.

42. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would

be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

43. To discharge their duties, the officers and directors of Anavex were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Anavex were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, New York, and the United States, and pursuant to Anavex's own Business Code of Conduct & Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Anavex conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Anavex and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Anavex's operations would comply with all

applicable laws and Anavex's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44. Each of the Individual Defendants further owed to Anavex and the shareholders the duty of loyalty requiring that each favor Anavex's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

45. At all times relevant hereto, the Individual Defendants were the agents of each other and of Anavex and were at all times acting within the course and scope of such agency.

46. Because of their advisory, executive, managerial, directorial, and controlling positions with Anavex, each of the Individual Defendants had access to adverse, non-public information about the Company.

47. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Anavex.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (2) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (3) artificially inflate the Company's stock price.

50. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Anavex was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

52. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Anavex and was at all times acting within the course and scope of such agency.

## ANAVEX'S CODE OF CONDUCT

53. The Company's Code of Conduct states that its purpose is to carry out Anavex's policy of "[o]beying the law both in letter and in spirit[,]" which purportedly "reflects the highest standards of corporate behavior[.]" The Code of Conduct notes that it "is intended to cover Anavex's and its affiliates' directors, officers and employees, as well [as] agents and other parties acting on behalf, or for the benefit, of the Company and/or its affiliates (collectively, 'Covered Persons')." In addition, the Code of Conduct states that the Company "expects all Covered Persons to abide by [the Code of Conduct]" and further provides the following, in relevant part:

> Any Covered Person who violates the standards set forth in the Code may be subject to disciplinary action which, depending on the nature of the violation and the history of the Covered Person, may range from a warning to a termination of employment and in appropriate cases, civil legal action or referral for regulatory or criminal prosecution.

54. In the section titled "Responsibilities," the Code of Conduct states the following, in relevant part:

> The Company shall take reasonable steps to monitor and audit compliance with the Code of Conduct, including the establishment of monitoring and auditing systems that are reasonably designed to detect violations of the Code of Conduct. Additionally, the Company will periodically review the Code of Conduct, and when necessary or desirable, make recommendations to ensure:
>
> - its continued conformance to applicable law,
> - that it meets or exceeds industry standards, and

- that any weaknesses revealed through monitoring, auditing and reporting systems are eliminated or corrected. The Company may revise, change or amend the Code of Conduct, or any policies or procedures, at any time.

55. In the section titled "Honest and Ethical Conduct," the Code of Conduct states the following:

> Each Covered Person must always conduct himself or herself in an honest and ethical manner. Each Covered Person must act with the highest standards of personal and professional integrity and not tolerate others who attempt to deceive or evade responsibility for their actions. All actual or potential conflicts of interest between personal and professional relationships must be handled honestly, ethically and in accordance with the policies specified in this Code. In addition, all Covered Persons must be direct, honest and truthful in discussions with, or requests for information from, the Board, regulatory agency officials and government officials, as well as in all dealings with business partners and shareholders. Every Covered Person is accountable for adhering to the Company's commitment to conduct its business fairly, honestly and with integrity.

56. In the section titled "Compliance With Applicable Governmental Laws, Rules and Regulations," the Code of Conduct states the following, in relevant part:

> All Covered Persons must respect and obey the laws, rules and regulations (including insider trading laws) of the jurisdictions in which we operate and the rules and regulations applicable to the Company, its business and its affiliates (collectively, the "**Company Group**"), including those of the NASDAQ and the Securities and Exchange Commission (the "**SEC**"). The Company shall hold periodic training sessions to ensure all employees are aware of and comply with the relevant laws, rules and regulations associated with their employment. Although not all Covered Persons are expected to know the details of the laws, rules and regulations to which the Company Group is subject, it is important to understand enough to determine when it is necessary or appropriate to seek advice from supervisors, managers or other persons, including the CEO and/or Board of Directors ("**Board**"), who can provide guidance on such matters.
>
> Disregard of the law will not be tolerated. Violation of any applicable laws, rules and regulations may subject an individual, as well as one or more members of the Company Group, to civil, administrative and/or criminal penalties and may harm their reputations. Covered Persons should be aware that conduct and records, including e-mails, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. Consequently, it is in everyone's best interest to understand and comply with the laws, rules and regulations applicable to the Company Group.

Areas that require particular attention to ensure proper compliance include:

***

- Insider Trading Laws: All members of board of directors and of executive boards, and their auxiliary staff in the Company Group, will be severely penalized if they make use of "hot information" (i.e. information that is not available to the general public, facts which could substantially influence the price of a listed security) that is in their possession to create a financial advantage for themselves or for some third party by purchasing (prior to the announcement of favorable information) or selling (prior to the announcement of unfavorable information) stock that is listed on an exchange or other securities. The insider trading provisions affect securities of Anavex Life Sciences Corp., and those of companies that are being acquired or merged with Anavex or a Company with which Anavex is planning to enter into a strategic alliance, if the said securities are listed on an exchange or traded in pre-market dealings.

***

- Laws and Regulations relating to Records Retention: The Company must comply with all laws and regulations mandating specified time periods for retaining various records of Company's activities. It is the responsibility of each direct report of the CEO working with his/her staff and the CEO, to establish and maintain a system for the retention and safekeeping of all records that are required by law or Company Policy.

- Laws Governing Pharmaceutical Products: The Company must comply with all laws and regulations governing the manufacture, testing, review and approval, sales, marketing, shipment, storage, and destruction of pharmaceutical products set forth by the Food and Drug Administration, the Drug Enforcement Administration, the local authorities and the European Union and its member states. In conducting clinical trials of pharmaceutical products, the Company will comply with rules governing human subject protection, animal welfare, and public disclosure of clinical trials for serious and life threatening diseases. The distribution of pharmaceutical samples must comply with the Prescription Drug Marketing Act. These laws and regulations are complex, technical, and comprehensive. Therefore, all employees shall take steps to become familiar with those areas directly relevant to their responsibilities and shall consult with the CEO to obtain guidance on issues or areas of law or regulation that might arise during the normal course of business.

***

- Responsibility of Company Personnel: Every director, officer, or employee has the responsibility to report a violation or suspected violation of this Policy. The Company promptly responds to all reports of suspected violations. Any Director, officer, or employee who knows or believe that any other Director, officer, or employee of the Company, or anyone else representing the Company, is violating or is suspected of violating this Policy should contact his supervisor or the CEO.

(Emphases in original).

57. In the section titled "Conflict of Interest," the Code of Conduct states the following, in relevant part:

> All Covered Persons have a duty to avoid business, financial or other direct or indirect relationships that conflict with the interests of the Company or that divide his or her loyalty to the Company. A conflict of interest occurs when your personal interest interferes or appears to interfere with the interests of the Company, or the Company Group as a whole. A conflict situation can arise, for example, when a Covered Person takes actions or has interests that may make it difficult to perform his or her work for the Company honestly, objectively and fairly. It is almost always a conflict for a Company officer or employee to work simultaneously for a competitor, customer, or supplier or to work for a competitor as a consultant or board member. Conflicts of interest also arise when a Covered Person, or any Family Member (as defined below) of such person, receives improper personal benefits as a result of his or her position at the Corporation. Loans to, other than those made in the ordinary course of business, or guarantees of obligations of, employees or their Family Members may also create a conflict of interest. Covered Persons may not participate in a joint venture, partnership or other business arrangement with the Company, without the prior approval of a majority of the Board.
>
> Any activity which even appears to present a conflict must be avoided or terminated unless, after disclosure to the Company, it is determined that the activity is not harmful to the Company or otherwise improper. It is our responsibility to disclose any material transaction or relationship that could be expected to give rise to a conflict of interest to the CEO or Board of Directors. Managers may not authorize conflict of interest matters or make determinations as to whether a problematic conflict of interest exists without first seeking the approval of the CEO including a written description of the activity. Officers and directors may seek authorizations and determinations from the Nominating and Corporate Governance Committee of the Board of Directors.

58. In the section titled "Compliance Procedures; Reporting Violations," the Code of Conduct states the following, in relevant part:

> As part of its commitment to ethical and legal conduct, Covered Persons must bring to attention information about suspected or known violations of law or policy by any employee, contractor or agent of the Company to the CEO or an appropriate manager. Violations should be reported regardless of the identity or position of the person suspected of engaging in improper conduct. The Company expects all Covered Persons to work to ensure prompt and consistent action against violations of this Code. This Code covers a wide range of business practices and procedures, but it does not address every applicable law or respond to every ethical question or concern that may arise. Nonetheless, the general guidelines of this Code provide each Covered Person with the Company's expectations regarding business dealings. The Company understands that there may be some situations in which it is difficult to know right from wrong.

59. In the section titled "Accounting Complaints," the Code of Conduct states the following:

> The Company's policy is to comply fully with all applicable financial reporting and accounting regulations. If any Covered Person has unresolved concerns or complaints regarding questionable accounting, internal control or auditing matters concerning the Company, such person is encouraged to submit such concerns or complaints in accordance with the Company's Complaint Procedures."

60. In the section titled "Insider Trading," the Code of Conduct states the following:

> The laws against insider trading of the Company's (or other) securities are specific and complex. Covered Persons may obtain, or come into regular or occasional contact with, information that qualifies as "inside information" under applicable securities laws. Inside information includes material information about the Company that is not available to the public. The unauthorized use by a Covered Person of inside information is unethical and may also be unlawful. Covered Persons should never trade the shares or other securities of the Company while in possession of inside information, nor should they disclose such information to any other person that might engage in trading activities, unless in compliance with the Company's Policy on Insider Information and Insider Trading. In all cases, it is each Covered Person's responsibility to ensure that he or she complies with all relevant securities laws and regulations.

61. In the section titled "Business Records," the Code of Conduct states the following, in relevant part:

> The Company has a responsibility to ensure that it provides the investing public with information that accurately and fairly reflects the true value of its operations. Accurate and fair records are essential to ensure the proper conduct of the Company's business and its compliance with the law.

> ***
>
> No false, misleading or artificial entries may be made by any Covered Person in the books and records of the Company or the Company Group. All Covered Persons with supervisory responsibility shall establish and implement appropriate internal accounting controls over all areas of their responsibility to ensure the safeguarding of the Company's assets and the accuracy of its financial records and reports. The Company has adopted controls in accordance with internal needs and the requirements of applicable laws and regulations. These established accounting practices and procedures must be followed to assure the complete and accurate recording of all transactions. All Covered Persons, within their areas of responsibility, are expected to adhere to these procedures, as directed by the Chief Financial Officer.
>
> ***
>
> Any accounting adjustments that materially depart from GAAP must be approved by the Company's Chief Financial Officer. In addition, all material off-balance-sheet transactions, arrangements and obligations, contingent or otherwise, and other relationships of the Company with unconsolidated entities or other persons that may have material current or future effects on the financial condition, changes in financial condition, results of operations, liquidity, capital expenditures, capital resources or significant components of revenues or expenses must be disclosed to the Company's Chief Financial Officer.
>
> The Audit Committee plays an important role in ensuring the integrity of our public reports. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board of Directors. In particular, our CEO and senior financial officers should promptly notify the Audit Committee any such information of which he or she may become aware including the accuracy of material disclosures in public filings, material weaknesses or significant deficiencies in internal controls over financial reporting and any evidence of fraud that involves an employee with a significant role in our financial reporting disclosures or internal controls or procedures.
>
> No Covered Person may interfere with or seek to improperly influence, directly or indirectly, the auditing of the Company's financial records. Violation of these provisions shall result in disciplinary action, up to and including termination of employment, and may also subject the violator to substantial liability.

62. In the section titled "Records Management," the Code of Conduct states the following:

> The Company has implemented measures to ensure that its records will be appropriately safeguarded. The Company's employees will retain records for as

> long as they are required and in the manner required to meet its legal, regulatory, administrative and operational requirements, after which they may be appropriately discarded. In many instances, there are legal requirements that certain records be retained for specific periods of time and may be appropriately disposed of once that period of time has elapsed. Records necessary for business reasons will be retained for a period of time that will reasonably assure the availability of those records when needed. Whenever it becomes apparent that records of any type will be required in connection with a lawsuit or government investigation, all relevant records should be preserved, and ordinary disposal or alteration of records pertaining to the subject of the litigation or investigation should be suspended. If an employee is uncertain whether records under his or her control should be preserved because they might relate to a lawsuit or investigation, he or she should contact the CEO.

63. In the section titled "Retention of Business Records," the Code of Conduct states the following:

> Records retention policies seek to establish consistent practices concerning how long records should be kept and when, in the normal course of business, they should be destroyed. All Covered Persons must comply at all times with all laws, rules and regulations relating to records preservation, all records retention policies and all document or record preservation notices. Records must be maintained for the duration of the assigned retention periods. A record includes any information, regardless of physical format, which has been created or received in the transaction of the Company's business. Physical format of a record includes paper documents, CDs, DVDs, computer hard disks, e-mail, floppy disks, microfiche, microfilm or all other media and data storage devices. The retention and proper disposal of the Company Group's records shall be in accordance with established Company policies and applicable legal and regulatory requirements.
>
> If the existence of any pending or threatened legal action, subpoena or investigation is known or reported to you, promptly contact the CEO. You must retain all records that may relate to any pending or threatened legal action, subpoena or investigation. If you have a question as to whether a record pertains to a pending or threatened legal action, subpoena or investigation, contact the CEO before disposing of the record in question.

64. In the section titled "Waivers of Changes to the Code of Business Conduct and Ethics," the Code of Conduct states the following:

> It may be appropriate for a provision of this Code to be waived in a particular circumstance. Any waiver of, or changes to, this Code that apply to executive officers or directors of the Company may be made only by the Nominating Committee or another committee of our Board comprised solely of independent non-executive directors or a majority of our independent non-executive directors

> and must be promptly disclosed to shareholders as required by law or regulation of the SEC and the rules of the Nasdaq. In particular, to the extent that such committee determines to grant any waiver of this Code for an executive officer or director, the waiver shall be disclosed to shareholders within four business days of such determination through a press release, providing website disclosure, or by filing a current report on Form 8-K with the SEC. Any other Covered Person seeking a waiver should speak to his or her supervisor, who, in turn, should obtain the written approval of the CEO regarding such matter.
>
> For the avoidance of doubt, no waiver shall be given from any provision of this Code that is not permitted under applicable law, rules or regulations.

65. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue or cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**ANAVEX'S AUDIT COMMITTEE CHARTER**

66. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). In the section titled "Audit Committee Purpose," the Audit Committee Charter notes the responsibilities of the Audit Committee as follows, in relevant part:

> (i) Oversee the Corporation's accounting and financial reporting processes and disclosure related thereto, and audits of the Corporation's financial statements.
> (ii) Oversee the integrity of the Corporation's financial reporting process and systems of internal controls regarding finance, accounting, and legal compliance.
> (iii) Oversee the independence and performance of the Corporation's independent auditors.
> (iv) Provide an avenue of communication among the independent auditors, management and the Board of Directors.

67. In the section titled "Audit Committee Responsibilities and Duties," under the subheading "Document/Reports Review Procedures," the Audit Committee Charter notes the following responsibilities of the Audit Committee, in relevant part:

> 3. The Committee shall review with management and the independent auditors the Corporation's quarterly financial results and quarterly unaudited financial statements, the Corporation's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," and the Corporation's selection, application and disclosure of critical accounting policies and practices used in such financial statements. The discussion of financial statements and the related critical accounting policies and practices shall occur prior to the public release of such financial statements or results, and the discussion of the related disclosure, including "Management's Discussion and Analysis of Financial Condition and Results of Operations," shall occur prior to the filing of the Form 10-Q.
>
> 4. Discuss with management and the independent auditors policies with respect to risk assessment and risk management and the quality and adequacy of the Corporation's processes and controls that could materially affect the Corporation's financial statements and financial reporting. Discuss significant financial risk exposures and the steps management has taken to monitor, control and report such exposures. Review significant findings prepared by the independent auditors together with management's responses.
>
> ***
>
> 7. Review disclosures made to the Committee by the Corporation's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Forms 10-Q about any significant deficiencies in the design or operation of internal controls or material weaknesses therein and any fraud involving management or other employees who have a significant role in the Corporation's internal controls.

68. In the same section, under the subheading "Legal & Compliance," the Audit Committee Charter notes the following responsibilities of the Audit Committee:

> 1. On at least an annual basis, review with the Corporation's counsel any legal matters that could have a significant impact on the organization's financial statements, the Corporation's compliance with applicable laws and regulations, inquiries received from regulators or governmental agencies.
>
> 2. Discuss with management and the independent auditors at least annually the Corporation's guidelines and policies with respect to enterprise risk assessment and

> risk management, including but not limited to risks relating to the Corporation's information technology use and protection, data governance, privacy, and cybersecurity, and the Corporation's strategy to mitigate such risks. The Committee should discuss the Corporation's major financial risk exposures and the overall steps management has taken to monitor and control such exposures.

69. In the same section, under the subheading "Other Audit Committee Responsibilities," the Audit Committee Charter states the following:

> 1. Review and approve all related-party transactions involving Covered Persons as defined in the Corporation's Code of Business Conduct and Ethics.
>
> 2. Monitor, oversee and review compliance with the provisions of the Corporation's Code of Business Conduct and Ethics that relate to accounting disclosures and regulations of the Securities and Exchange Commission ("SEC") or NASDAQ.
>
> 3. Serve as the initial reviewing body for allegations of violations of the Code of Business Conduct and Ethics or requests for waivers of the provisions of the Code of Business Conduct and Ethics by a director or executive officer of the Corporation that relate to accounting disclosures and regulations of the SEC or Nasdaq.
>
> 4. Annually prepare a report to shareholders as required by the Securities and Exchange Commission. The report should be included in the Corporation's annual proxy statement.
>
> 5. At least annually review the Corporation's director and officer insurance provisions.
>
> 6. Perform any other activities consistent with this Charter, the Corporation's Bylaws and governing law, as the Committee or the Board deems necessary or appropriate.
>
> 7. Maintain minutes of meetings and periodically report to the Board of Directors on significant results of the foregoing activities.
>
> 8. Establish procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls, or auditing matters and of the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

70. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public

and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

***Background on Anavex***

71. Anavex is a Nevada corporation engaged in the biopharmaceutical industry, particularly at the clinical stages of research and development. The Company focuses on the development of precision medicines to treat various CNS diseases, namely Alzheimer's disease, Parkinson's disease, schizophrenia, Rett Syndrome, and other disorders. Notable CNS-related products in Anavex's pipeline include Anavex 2-73 and Anavex 3-71.

72. Anavex 2-73 is intended as an oral once-daily capsule formulation for neurodegenerative and neurodevelopmental diseases such as Alzheimer's disease and Parkinson's disease. Anavex 2-73 has completed several clinical trials while demonstrating positive results, namely in November 2016 and July 2018 for the treatment of Alzheimer's disease, in October 2020 for the treatment of Parkinson's disease, and in June 2019 for the treatment of Rett syndrome. The Company has also noted the potential for its use in the treatment of other diseases.

73. Anavex 3-71 is also intended to treat Alzheimer's disease, and has been approved by the U.S. Food and Drug Administration ("FDA") for the treatment of Frontotemporal Demetia.

Anavex 3-71 has likewise completed clinical trials with positive indications, such as in July 2020 for the treatment of Alzheimer's disease and in March 2024 for the treatment of schizophrenia.

74. The Company's products purport to halt or delay CNS diseases such as those noted above by correcting deficiencies in the overall balance of a patient's cellular environment, or cellular homeostasis. To accomplish this, Anavex's products primarily bind to, and act upon, the sigma-1 receptors ("SIGMAR1") in a patient's cells. According to the Company, SIGMAR1 receptors can be utilized to influence biochemical signals pertaining to disease origin and development and thus provide effective medical treatment.

75. Anavex is also currently in the process of applying its SIGMAR1-related products to the treatment of various cancers, such as malignant melanoma, prostate cancer, and pancreatic cancer. To this end, the Company is developing ANAVEX®1037 ("Anavex 1037"). Anavex 1037 is currently in the pre-clinical and clinical testing stages of development.

**False and Misleading Statements**

***November 25, 2025 Form 10-K***

76. The Relevant Period began on November 25, 2025 when the Company filed the FY 2025 10-K with the SEC. The FY 2025 10-K was signed by Defendants Missling, Ma, Velden, Thomas, and Donhauser. Attached to the FY 2025 10-K were certifications pursuant to pursuant to Sections 13(a) or 15(d) of the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendant Missling. The SOX certifications attested to the accuracy of the FY 2025 10-K and that "[t]he information contained in the [FY 2025 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

77. The statements referenced and identified in ¶ 76 above were materially false and misleading, given that the Company later revealed that it failed to maintain internal controls over

its financial reporting as a result of the CEO Misconduct. Moreover, the Company later terminated Defendant Missling for cause as a result of the CEO Misconduct, including his failure to ensure that the information in the FY 2025 10-K was accurate. The falsity of the statements is further underlined by the Amended FY 2025 10-K, which the Company filed on August 28, 2026.

78. The FY 2025 10-K also stated the following concerning the Company's disclosure controls and procedures, in relevant part:

> ***Disclosure Controls and Procedures***
>
> We maintain disclosure controls and procedures that are designed to provide reasonable assurance that material information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and to provide reasonable assurance that such information is accumulated and communicated to our management, our chief executive officer and our principal financial officer, to allow timely decisions regarding required disclosure.
>
> We carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Principal Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13(a)-15(e) under the Exchange Act. ***Based on this evaluation, our Chief Executive Officer and Principal Financial Officer concluded that our disclosure controls and procedures were effective as of September 30, 2025***.
>
> ***Management's Annual Report on Internal Control over Financial Reporting***
>
> Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Under the supervision and with the participation of our management, including our Principal Executive Officer and Principal Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on criteria established in the framework in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risks that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

> ***Based on this evaluation, our management concluded that our internal controls over financial reporting were effective as of September 30, 2025.***
>
> The effectiveness of our internal controls over financial reporting as of September 30, 2025 has been audited by Grant Thornton LLP, an independent registered public accounting firm, as stated in their report which appears in this Annual Report on Form 10-K.

79. The statements referenced and identified in ¶ 78 above were materially false and misleading because, as the Company later disclosed, it failed to maintain effective internal controls over its financial reporting due to the CEO Misconduct. The Company's failure to maintain effective internal controls is further evidenced from Anavex's filing of the Amended FY 2025 10-K, Amended Q1 FY 2026 10-Q, Q2 FY 2025 10-Q, and Q3 FY 2025 10-Q, all of which disclosed the same issues concerning such internal controls.

80. The FY 2025 10-K also included a discussion of the risks facing the Company, stating the following, in relevant part:

> ***The regulatory approval processes of the FDA, EMA and comparable foreign regulatory authorities are lengthy, time-consuming and inherently unpredictable, which could lead to our inability to generate product revenue.***
>
> The time required to obtain approval by the FDA, EMA and comparable foreign regulatory authorities is unpredictable, typically takes many years following the commencement of clinical trials and depends upon numerous factors, including the type, complexity and novelty of the product candidates involved. Seeking foreign regulatory approvals could result in significant delays, difficulties and costs for us and may require additional preclinical studies or clinical trials which would be costly and time consuming. Regulatory requirements can vary widely from country to country and could delay or prevent the introduction of our product candidates in those countries. In addition, approval policies, regulations or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions, which may cause delays in the approval or the decision not to approve an application. Regulatory authorities have substantial discretion in the approval process and may refuse to accept any application or may decide that our data are insufficient for approval and require additional preclinical, clinical or other data. Satisfying these and other regulatory requirements is costly, time consuming, uncertain and subject to unanticipated delays. Our failure to obtain regulatory approval in any country may delay or have negative effects on the process for regulatory approval in other

countries. Even if we eventually complete clinical testing and receive approval of any regulatory filing for our product candidates, the FDA, EMA and comparable foreign regulatory authorities may approve our product candidates for a more limited indication or a narrower patient population than we originally requested. If we fail to comply with regulatory requirements in international markets or to obtain and maintain required approvals, our target market will be reduced and our ability to realize the full market potential of our product candidates will be harmed. Applications for our product candidates could fail to receive regulatory approval for many reasons, including but not limited to the following:

- the FDA, EMA or comparable international regulatory authorities may disagree with the design, implementation or results of our clinical trials;
- the FDA, EMA or comparable international regulatory authorities may determine that our product candidates are not safe and effective, only moderately effective or have undesirable or unintended side effects, toxicities or other characteristics that preclude our obtaining marketing approval or prevent or limit commercial use;
- the population studied in the clinical program may not be sufficiently broad or representative to assure efficacy and potency and safety in the full population for which we seek approval;
- the FDA, EMA or comparable international regulatory authorities may disagree with our interpretation of data from preclinical studies or clinical trials;
- the data collected from clinical trials of our product candidates may not be sufficient to support the submission of a Biologics License Application, New Drug Application or other submission or to obtain regulatory approval in the United States or elsewhere;
- we may be unable to demonstrate to the FDA, EMA or comparable international regulatory authorities that a product candidate’s risk-benefit ratio for its proposed indication is acceptable;
- the FDA or comparable international regulatory authorities may fail to approve the manufacturing processes, test procedures and specifications or facilities of third-party manufacturers with which we contract for clinical and commercial supplies; and
- the approval policies or regulations of the FDA, EMA or international foreign regulatory authorities may significantly change in a manner rendering our clinical data insufficient for approval.

In order to market any product candidates outside of the United States, we must establish and comply with numerous and varying regulatory requirements of other countries regarding safety and efficacy and potency and approval standards. Clinical trials conducted in one country may not be accepted by regulatory authorities in other countries, and regulatory approval in one country does not mean that regulatory approval will be obtained in any other country.

> The ability of the FDA to review and approve new products can be affected by a variety of factors, including government budget and funding levels, ability to hire and retain key personnel and accept the payment of user fees, government shutdowns, including as a result of budget delays or other circumstances like the COVID-19 pandemic and statutory, regulatory and policy changes. Average review times at the agency have fluctuated in recent years as a result. This lengthy approval process, as well as the unpredictability of the results of clinical trials, may result in our failing to obtain regulatory approval to market any of our product candidates, which would significantly harm our business, results of operations and prospects.

81. The statements referenced and identified in ¶ 80 above were materially false and misleading because they failed to disclose that the CEO Misconduct materially hindered the Company's path towards regulatory approval for its products. Namely, as the Company later admitted, the CEO Misconduct resulted in the Company disincentivizing regulatory compliance.

82. The FY 2025 10-K also contained the following risk disclosure pertaining to regulatory approval, in relevant part:

> ***Obtaining and maintaining regulatory approval of blarcamesine or any future product candidates in one jurisdiction does not mean that we will be successful in obtaining regulatory approval of those product candidates in other jurisdictions.***
>
> Obtaining and maintaining regulatory approval of blarcamesine and any future product candidates in one jurisdiction does not guarantee that we will be able to obtain or maintain regulatory approval in any other jurisdiction, while a failure or delay in obtaining regulatory approval in one jurisdiction may have a negative effect on the regulatory approval process in others. Approval procedures vary among jurisdictions and can involve requirements and administrative review periods different from each other, including additional preclinical studies or clinical trials, as clinical trials conducted in one jurisdiction may not be accepted by regulatory authorities in other jurisdictions. In many jurisdictions outside the U.S., including Canada, and certain jurisdictions in the EU, a product candidate must be approved for reimbursement before it can be approved for sale in that jurisdiction. In some cases, the price that we intend to charge for our products is also subject to approval.
>
> Regulatory authorities in jurisdictions outside of the U.S. have requirements for approval of product candidates with which we must comply prior to marketing in those jurisdictions and such regulatory requirements can vary widely from country to country. Obtaining other regulatory approvals and compliance with other regulatory requirements could result in significant delays, difficulties and costs for

> us and could require additional preclinical studies or clinical trials, which could be costly and time-consuming and could delay or prevent the introduction of our products in certain countries. The foreign regulatory approval process involves all of the risks associated with FDA approval. We do not have experience in obtaining regulatory approval in international markets or within the United States. If we fail to comply with the regulatory requirements in international or domestic markets and/or obtain and maintain applicable marketing approvals, our target market will be reduced and our ability to realize the full market potential of blarcamesine or any future product candidates will be harmed.

83. The statements referenced and identified in ¶ 82 above were materially false and misleading because they failed to disclose that the CEO Misconduct materially hindered the Company's path towards regulatory approval for its products. Namely, as the Company later admitted, the CEO Misconduct resulted in the Company disincentivizing regulatory compliance.

***February 9, 2026 Form 10-Q***

84. On February 9, 2026, the Company filed its Quarterly Report on Form 10-Q with the SEC to report its financial and operational results for the first quarter of FY 2026 (the "Q1 FY 2026 10-Q"). The Q1 FY 2026 10-Q was signed by Defendant Missling and attached SOX certifications signed by Defendant Missling. The SOX certifications attested to the accuracy of the Q1 FY 2026 10-Q and that "the information contained in the [Q1 FY 2026 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

85. The statements referenced and identified in ¶ 84 above were materially false and misleading, given that the Company later revealed that it failed to maintain internal controls over its financial reporting as a result of the CEO Misconduct. Moreover, the Company later terminated Defendant Missling for cause as a result of the CEO Misconduct, including his failure to ensure that the information in the FY 2025 10-K was accurate. The falsity of the statements is further underlined by the Amended Q1 FY 2026 10-Q which the Company filed on August 28, 2026.

86. The Q1 FY 2026 10-Q stated the following regarding the Company's disclosure controls and procedures, in relevant part:

> We maintain disclosure controls and procedures that are designed to provide reasonable assurance that material information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and to provide reasonable assurance that such information is accumulated and communicated to our management, our chief executive officer and our principal financial officer, to allow timely decisions regarding required disclosure.
>
> We carried out an evaluation, under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rule 13a-15(e) under the Exchange Act, as of the end of the period covered by this Quarterly Report on Form 10-Q. ***Based on this evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures were effective as of December 31, 2025***.

87. The statements referenced and identified in ¶ 86 above were materially false and misleading because, as the Company later disclosed, it failed to maintain effective internal controls over its financial reporting due to the CEO Misconduct. The Company's failure to maintain effective internal controls is further evidenced from Anavex's filing of the Amended FY 2025 10-K, Amended Q1 FY 2026 10-Q, Q2 FY 2025 10-Q, and Q3 FY 2025 10-Q, all of which disclosed the same issues concerning such internal controls.

**<u>The Truth Emerges</u>**

***May 6, 2026 Form 8-K and Press Release***

88. The truth began to emerge on May 6, 2026 when the Company filed the CEO Termination 8-K with the SEC. The CEO Termination 8-K stated the following, in relevant part:

> ***On April 30, 2026, a special committee (the "Special Committee") composed of independent directors of the Board of Directors (the "Board") of Anavex Life Sciences Corp. (the "Company") terminated the employment of Christopher Missling, PhD as the Company's Chief Executive Officer for Cause*** (as defined in the Employment Agreement, dated as of June 27, 2013, between Dr. Missling

> and the Company, as amended and restated), ***effective immediately, for, among other things, conduct that the Special Committee believed was inconsistent with Company policy***. The Special Committee has also requested that Dr. Missling resign as a member of the Board.

89. That same day, the Company issued a press release concerning the termination of Defendant Missling (the "CEO Termination Press Release"). The CEO Termination Press Release stated the following, in relevant part:

> [Anavex] today announced that its Board of Directors has appointed the Company's former Senior Vice President of Clinical Development and current Senior Advisor, Terrie Kellmeyer, PhD, as Interim Chief Executive Officer. ***These appointments follow the departure of President and Chief Executive Officer Christopher Missling, PhD, MS, MBA, from the Company on April 30, 2026, and a request for his resignation from the Board of Directors.*** Dr. Kellmeyer will lead the Company's next phase of growth that aligns with its strategic initiatives in enhancing the clinical development programs of the Company's current portfolio.

90. On this news, the price per share of the Company's stock fell $0.02, or approximately 0.6%, from a closing price of $3.36 per share on May 5, 2026, to close at $3.34 per share on May 6, 2026.

***May 11, 2026 Notification of Late Filing***

91. The truth continued to emerge on May 11, 2026 when the Company filed the May 2026 Notification of Late Filing with the SEC, reporting that the Company would be unable to timely file the Q2 FY 2026 10-Q. The May 2026 Notification of Late Filing stated the following, in relevant part:

> [Anavex] is unable to timely file its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2026 (the "Form 10-Q") by the prescribed May 11, 2026 due date without unreasonable effort and expense due to the circumstances described below. As previously disclosed in the Company's Current Report on Form 8-K filed on May 6, 2026, a special committee (the "Special Committee") composed of independent directors of the Board of Directors (the "Board") terminated the employment of Dr. Christopher Missling as the Chief Executive Officer of the Company on April 30, 2026 ***for, among other things, conduct that the Special Committee believed was inconsistent with Company Policy. On May***

> ***4, 2026, the Special Committee appointed Dr. Terrie Kellmeyer as Interim Chief Executive Officer.***
>
> Until the Special Committee and the Company complete their review of certain matters related to the termination of Dr. Missling and Dr. Kellmeyer has had sufficient opportunity to review the Form 10-Q prior to its certification and filing, the Company will be unable to complete its preparation and review of the Form 10-Q without unreasonable effort or expense. The Special Committee and the Company are working diligently to complete their review so that the Company can file the Form 10-Q.

92. On this news, the price per share of the Company's stock fell $0.18, or approximately 5.5%, from a closing price of $3.24 per share on May 11, 2026, to close at $3.06 per share on May 12, 2026.

***August 28, 2026 Amended Form 10-K, Amended Form 10-Q, and Forms 10-Q***

93. The truth fully emerged on August 28, 2026, after the market closed, when the Company filed the Amended FY 2025 10-K with the SEC. The Amended FY 2025 10-K stated the following, in relevant part:

> As previously disclosed in a Current Report on Form 8-K, filed with the Securities and Exchange Commission ("SEC") on May 6, 2026, on April 30, 2026, a special committee (the "Special Committee") composed of independent directors of the Board of Directors of the Company (the "Board") terminated the employment of the Company's former Chief Executive Officer ("CEO") for Cause (as defined in the Employment Agreement, dated as of June 27, 2013, between the Company and its former CEO, as amended and restated), effective immediately for, among other things, conduct that the Special Committee believed was inconsistent with Company policy. ***As a result of the review by the Special Committee, management, in consultation with the Audit Committee of the Board (the "Audit Committee"), concluded that there was a material weakness in internal control over financial reporting that existed at September 30, 2025.*** Accordingly, the Company's internal control over financial reporting as of September 30, 2025, as reported in its Annual Report on Form 10-K for the fiscal year ended September 30, 2025 (the "Original Form 10-K") was not effective. ***In addition, the Company's disclosure controls and procedures were not effective as of September 30, 2025, due to the material weakness in internal control over financial reporting as described above.***

94. The Amended FY 2025 10-K also discussed the Company's inadequate internal controls over its financial reporting, stating the following, in relevant part:

> Management identified deficiencies in our Control Environment and Information and Communication controls related to the historical flow of regulatory, clinical and nonfinancial information.
>
> We did not maintain an effective Control Environment ***because our former CEO failed to set an appropriate tone at the top. There was a lack of transparency with the Board regarding regulatory, clinical and non-financial matters, and the former CEO failed to foster an environment which prioritized regulatory and clinical compliance and in fact took steps to disincentivize such efforts.***
>
> ***Additionally, we failed to maintain effective controls over Information and Communication as historically, our former CEO served as a principal source and decision-maker with respect to regulatory, clinical and non-financial matters and related communications. We did not maintain sufficiently independent and formalized mechanisms to ensure that regulatory, clinical and non-financial information was communicated completely and timely to our principal financial officer, the Audit Committee and the Board, and other disclosure-process participants.***
>
> In particular, the historical process did not include certain controls that our management has subsequently determined were necessary to provide reasonable assurance regarding the completeness of regulatory, clinical and non-financial information used in our disclosure and financial reporting processes, including a formal disclosure committee (the "Disclosure Committee"), recurring functional sub-certifications, routine access by appropriate disclosure-process participants to relevant source regulatory, clinical and nonfinancial information, formal source-document reconciliation procedures and a documented escalation process for regulatory, clinical and non-financial information.
>
> The material weakness resulted from an overreliance on our former CEO as the principal source and gatekeeper for regulatory, clinical and non-financial information, together with insufficient independent controls to ensure that such information was communicated completely and timely to our financial reporting and disclosure-process participants, including the principal financial officer, Audit Committee and Board.
>
> As a result of these deficiencies, established downstream controls, including management review, legal review, Audit Committee review, Board review and executive certifications, could operate while relying on an incomplete information population, and thus were deemed ineffective. The deficiencies also increased the susceptibility of our information and communication processes to senior-management influence and management override.

> Management evaluated these deficiencies individually and in combination and concluded that they represent interrelated manifestations of an entity-level control deficiency. Accordingly, management concluded that these deficiencies, in the aggregate, constitute a material weakness because there was a reasonable possibility that a material misstatement of our annual or interim financial statements or related notes would not be prevented or detected on a timely basis. Specifically, the deficiencies could prevent information relevant to financial-reporting and SEC disclosure judgments, disclosures and certifications from entering the financial-reporting and SEC disclosure process before downstream accounting and review controls had an opportunity to operate.

95. Also during the after-market hours of August 26, 2026, the Company filed the Amended Q1 FY 2026 10-Q. The Amended Q1 FY 2026 10-Q stated the following regarding the Company's internal controls, in relevant part:

> As previously disclosed in a Current Report on Form 8-K, filed with the Securities and Exchange Commission ("SEC") on May 6, 2026, on April 30, 2026, a special committee (the "Special Committee") composed of independent directors of the Board of Directors of the Company (the "Board") terminated the employment of the Company's former Chief Executive Officer ("CEO") for Cause (as defined in the Employment Agreement, dated as of June 27, 2013, between the Company and its former CEO, as amended and restated), effective immediately for, among other things, conduct that the Special Committee believed was inconsistent with Company policy. ***As a result of the review by the Special Committee, management, in consultation with the Audit Committee of the Board (the "Audit Committee"), concluded that there was a material weakness in internal control over financial reporting that existed at September 30, 2025. Accordingly, the Company's internal control over financial reporting as of December 31, 2025, as reported in its Quarterly Report on Form 10-Q for the fiscal quarter ended December 31, 2025 (the "Original Form 10-Q") were not effective. In addition, the Company's disclosure controls and procedures were not effective as of December 31, 2025, due to the material weakness in internal control over financial reporting as described above.***

96. Moreover, during the after-market hours of August 26, 2026, the Company filed the Q2 FY 2026 10-Q and the Q3 FY 2026 10-Q with the SEC. The Q2 FY 2026 10-Q and the Q3 FY 2026 10-Q both stated the following concerning the Company's clinical trials and internal controls over financial reporting, in relevant part:

> Following a review of our clinical development strategy under new leadership, we have de-prioritized our other assets, including ANAVEX®3-71, currently in the clinical stage, and ANAVEX®1-41 and ANAVEX®1066, currently in preclinical development. Development work on these de-prioritized assets has been paused, and future development work will be contingent on additional funding for such assets or the signing of a strategic partnership for such assets. It is also possible that we may license or sell one or more of our assets.
>
> ***Following the previously disclosed termination of our former CEO in April 2026, management has determined that our disclosure controls and procedures and our internal controls over financial reporting were not effective as of September 30, 2025, December 31, 2025, March 31, 2026 and June 30, 2026***, which is further described in Part II, Item 4 of this Quarterly Report on Form 10-Q. ***As we align with the FDA on a clear, data-driven regulatory and clinical development strategy for ANAVEX 2-73 for early AD, Rett syndrome and Fragile X syndrome, we will obtain guidance from the FDA on the extent to which the efficacy data from our past clinical trials can be applied to our clinical development strategy,*** and, to the extent such guidance is relevant to our ongoing development plans, we expect to provide information on how this efficacy data is viewed by the FDA. ***In light of the foregoing, investors should rely only on the descriptions of our clinical trials, including for our de-prioritized assets, contained in this Quarterly Report on Form 10-Q (including the description below of the CHMP's Withdrawal Assessment Report on our submission to the EMA relating to ANAVEX 2- 73 as an add-on therapy for early Alzheimer's disease) and on any future updated information***.

97. On this news, the price per share of the Company's stock fell $0.19, or approximately 6.4%, from a closing price of $2.99 per share on August 28, 2026, to close at $2.80 per share on August 31, 2026.

## DAMAGES TO ANAVEX

98. As a direct and proximate result of the Individual Defendants' conduct, Anavex will lose and expend many millions of dollars.

99. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

100. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, including the CEO Misconduct, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

101. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

102. As a direct and proximate result of the Individual Defendants' conduct, Anavex has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

103. Plaintiff brings this action derivatively and for the benefit of Anavex to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Anavex, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

104. Anavex is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

105. Plaintiff is, and has been at all relevant times, a shareholder of Anavex. Plaintiff will adequately and fairly represent the interests of Anavex in enforcing and prosecuting its rights,

and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

106. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

107. A pre-suit demand on the Board of Anavex is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following six individuals: Defendants Ma, Donhauser, Paeger, and van der Velden (the "Director-Defendants"), and non-parties Gautam Patel and Adrian Senderowicz (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to three of the six Directors that were on the Board at the time of the filing of this complaint.

108. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

109. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Anavex to issue materially false and misleading statements. Specifically, the Director-Defendants caused Anavex to issue false and misleading statements which were intended to make Anavex appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls and due diligence procedures. As a result of the foregoing, the Director-Defendants

breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

110. Additional reasons that demand on Defendant Ma is futile follow. Defendant Ma has served as a Company director since May 2021 and as the Independent Chair of the Board since November 2021. Defendant Ma currently serves as a member of the Audit Committee and as a member of the Executive Committee. Defendant Ma receives lucrative compensation for her position as a Company director. As a trusted Company director, she conducted little, if any, oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Ma signed the materially false and misleading FY 2025 10-K. For these reasons, Defendant Ma breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

111. Additional reasons that demand on Defendant Donhauser is futile follow. Defendant Donhauser has served as a Company director since February 2017. Defendant Donhauser currently serves as a member of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Defendant Donhauser receives lucrative compensation for his position as a Company director. As a trusted Company director, he conducted little, if any, oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Donhauser signed the materially false and misleading FY 2025 10-K. For these reasons, Defendant Donhauser breached his fiduciary duties, faces a substantial likelihood

of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

112. Additional reasons demand on Defendant Paeger is futile. Defendant Paeger has served as a Company director since February 23, 2026. Defendant Paeger currently serves as a member of the Executive Committee. Defendant Paeger receives lucrative compensation for his position as a Company director. As a trusted Company director, he conducted little, if any, oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Paeger breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

113. Additional reasons that demand on Defendant van der Velden is futile follow. Defendant van der Velden has served as a Company director since March 2018. Defendant van der Velden currently serves as the Chair of the Audit Committee, as the Chair of the Nominating and Corporate Governance Committee, and as the Chair of the Compensation Committee. Moreover, Defendant van der Velden currently serves as a member of the Executive Committee. Defendant van der Velden receives lucrative compensation for his position as a Company director. As a trusted Company director, he conducted little, if any oversight into the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant van der Velden signed the materially false and misleading FY 2025 10-K. For these reasons, Defendant van der Velden breached his fiduciary

duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

114. Additional reasons that demand on the Board is futile follow.

115. Defendants van der Velden (as Chair) and Ma (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

116. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity; failing to ensure the Company's disclosures were accurate; failing to ensure the Company complied with applicable laws, rules, and regulations; and failing to promptly report known violations of the Code of

Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

117. Anavex has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Anavex any part of the damages Anavex suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

118. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

119. The acts complained of herein constitute violations of fiduciary duties owed by Anavex's officers and directors, and these acts are incapable of ratification.

120. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Anavex. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-

Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Anavex, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

121. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Anavex to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

122. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least three of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

**FIRST CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

123. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

124. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Anavex's business and affairs.

125. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

126. Additionally, Defendant Missling breached his fiduciary duties owed to Anavex by engaging in the CEO Misconduct.

127. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Anavex.

128. In breach of their fiduciary duties owed to Anavex, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Defendant Missling engaged in the CEO Misconduct; (2) the Company would terminate Defendant Missling for cause due to the CEO Misconduct; (3) the Company would be unable to timely file the Q2 FY 2026 10-Q; and (4) the Company would have to amend the FY 2025 10-K and the Q1 FY 2026 10-Q to account for the material weaknesses in its internal controls as a result of the CEO Misconduct. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

129. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

130. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

131. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company's internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to

fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

132. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

133. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Anavex has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

134. Plaintiff, on behalf of Anavex, has no adequate remedy at law.

## SECOND CLAIM
## Against the Individual Defendants for Unjust Enrichment

135. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Anavex.

137. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Anavex that was tied to the performance or artificially inflated valuation of Anavex or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

138. Plaintiff, as a shareholder and a representative of Anavex, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from

insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

139. Plaintiff, on behalf of Anavex, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Abuse of Control**

140. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

141. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Anavex, for which they are legally responsible.

142. As a direct and proximate result of the Individual Defendants' abuse of control, Anavex has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

143. Plaintiff, on behalf of Anavex, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

144. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

145. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Anavex in a manner consistent with the operations of a publicly held corporation.

146. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Anavex has sustained and will continue to sustain significant damages.

147. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

148. Plaintiff, on behalf of Anavex, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

149. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

150. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

151. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Anavex to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

152. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

153. Plaintiff, on behalf of Anavex, has no adequate remedy at law.

**SIXTH CLAIM**
**Against Defendant Missling for Contribution**
**Under Sections 10(b) and 21D of the Exchange Act**

154. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155. Anavex and Defendant Missling are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Missling's willful and/or reckless violations of his obligations as an officer and director of Anavex.

156. Defendant Missling, because of his position of control and authority as an officer and director of Anavex, was able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Anavex, including the wrongful acts complained of herein and in the Securities Class Action.

157. Accordingly, Defendant Missling is liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

158. As such, Anavex is entitled to receive all appropriate contribution or indemnification from Defendant Missling.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Anavex, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Anavex;

(c) Determining and awarding to Anavex the damages sustained by it as a result

of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Anavex and the Individual Defendants to take all necessary actions to reform and improve Anavex's corporate governance and internal procedures to comply with applicable laws and to protect Anavex and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
2. a provision to permit the shareholders of Anavex to nominate at least three candidates for election to the board; and
3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Anavex restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: October 21, 2026 Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/ Elizabeth Donohoe*
Elizabeth Donohoe
Saadia Hashmi
Timothy Brown
Zachary Benson
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
Email: shashmi@thebrownlawfirm.net
Email: tbrown@thebrownlawfirm.net
Email: zbenson@thebrownlawfirm.net

*Counsel for Plaintiff*

**VERIFICATION**

I, Denise DeAngelis, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of October 2026.

DocuSigned by:
D06C70242D7A424...
Denise DeAngelis